```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
                      CORPUS CHRISTI DIVISION


MICHAEL FAVATA, ET AL.,      )   CASE NO:  2:12-CV-0082
                             )
            Plaintiffs,      )         CIVIL
                             )
     vs.                     )   Corpus Christi, Texas
                             )
NATIONAL OILWELL VARCO, LP,  )   Monday, April 14, 2014
                             )   (11:17 a.m. to 11:29 a.m.)
            Defendant.       )


     OPENING STATEMENT OF PLAINTIFF DURING JURY TRIAL - DAY ONE


            BEFORE THE HONORABLE NELVA GONZALES RAMOS,
                  UNITED STATES DISTRICT JUDGE
```

Appearances:           See Next Page

Court Recorder:        Arlene Benavidez

Case Manager:          Brandy Cortez

Transcriber:           Exceptional Reporting Services, Inc.
                       P.O. Box 18668
                       Corpus Christi, TX 78480-8668
                       361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES FOR:**

Plaintiffs:					CHRISTOPHER E. MC JUNKIN, ESQ.
						Attorney at Law
						2842 Lawnview
						Corpus Christi, TX 78404

						- And -

						ADAM PONCIO, ESQ.
						Poncio Law Offices, PC
						5410 Fredericksburg Road
						Suite 109
						San Antonio, TX 78229

Defendant:					M. CARTER CROW, ESQ.
						GREG MOORE, ESQ.
						RAFE A. SCHAEFER, ESQ.
						Fulbright Jaworski, LLP
						1301 McKinney Street
						Suite 5100
						Houston, TX 77010-3095

						- And -

						DARRELL L. BARGER, ESQ.
						Hartline Dacus Barger Dreyer, LLP
						800 N. Shoreline Blvd.
						Suite 2000 North Tower
						Corpus Christi, TX 78401

**Corpus Christi, Texas; Monday, April 14, 2014; 11:17 a.m.**

(Entire proceeding recorded; partially transcribed)

(In the presence of the jury)

**MR. PONCIO:** Yes, Judge. Thank you, your Honor.

Well, good morning again. I'm glad that you were selected for the jury, and I hope that we can move forward quickly so that you're not here for two weeks or three weeks, which I don't anticipate. The good thing is we'll be working today through Thursday, off Friday, and then resume next Monday, but we anticipate it being finished by mid week of next week.

This is a case about unpaid overtime for the 55 plaintiffs that have opted into this case. Our claims are two. One, we claim that the 16-hour, one-man jobs -- there were jobs where a man would be assigned to a rig just for one man. And we believe the evidence will show that that one man didn't just work 16 hours; he was on duty 24 hours, because he had to monitor the equipment 24 hours a day. You will hear evidence that we believe that will show that he couldn't sleep, he had to constantly monitor that equipment 24 hours a day, he couldn't leave the premises, because -- in order to leave for groceries, to the grocery store, he had to leave the equipment on monitor while he was off duty, because he is only one man. So, periodically, when someone could watch the equipment, they might be able to leave. We believe that the defendants will

1  argue: Oh, he could leave; he could watch television; he could
2  go to sleep; he could do whatever he wanted during that extra
3  eight hours. And they're going to claim that he didn't have to
4  monitor that equipment that extra eight hours. But I think
5  you're going to find that all of the witnesses testify: I was
6  on duty 24 hours; I was monitoring that equipment.
7  There is also a claim for a two-man crew. And what
8  would happen is sometimes they would -- they would work for 12
9  hours, say from 6:00 to 6:00, and then they would be relieved
10 from 6:00 to 6:00, 6:00 in the evening to 6:00 in the morning.
11 That was a two-man crew. When they worked a two-man crew, they
12 got to bill for 12 hours. And you'll see that there is going
13 to be a policy that says when you work the one-man crew you can
14 only bill for a one-man crew for 16 hours. When you work for a
15 two-man crew, the most you can bill is for 12 hours. But
16 you're going to hear that the company's going to claim: Oh, we
17 told them write down all the hours they worked. But what
18 you're going to hear is that the managers, the managers who
19 receive bonuses based on the profits, the managers received a
20 bonus, so they would tell these employees --
21        **MR. CROW:** Your Honor, tries to violate the prior
22 order of the Court. Can we approach?
23        **THE COURT:** Yes.
24     **(Bench conference began at 11:20 a.m.)**
25        **MR. CROW:** Your Honor, we've got a motion in limine

1  on this bonus compensation plan that they've agreed to.

2  **MR. PONCIO:** Well, we're just showing it's -- the
3  reasons for the --

4  **THE COURT:** (indiscernible)

5  **MR. SPEAKER:** Okay. Thank you.

6  **MR. SPEAKER:** (indiscernible)

7  **(Bench conference concluded at 11:20 a.m.)**

8  **THE COURT:** Okay. Court's going to instruct the jury
9  to disregard this prior argument by counsel.

10  **MR. PONCIO:** We believe what the evidence is going to
11  show is that the managers told these employees: You cannot
12  write down more than 16 hours for a one-man crew or 12 hours
13  for a two-man crew. And when they did try to write down more
14  than 16 or 12, that they would get reprimanded or written up.
15  We're going to show you evidence of that. The company's going
16  to say: No, our policy was you just had to get prior approval.
17  Well, they knew that they were out there working 24 hours, but
18  they were telling them: You can only work 16 or 12.

19  We believe that the evidence will show that the 12-
20  hour, two-man shifts, that they were required to attend safety
21  meetings. Their normal start time was usually from 6:00 to
22  6:00, and then, again, the second man would work from 6:00 in
23  the evening to 6:00 the next morning again. And we believe the
24  evidence will show that they were required to attend safety
25  meetings, and their testimony will be if the company required

6

1  it, the company that hired NOV employees, then they had to go
2  to those safety meetings, and that they would have to show up
3  at 5:30 in the morning for a 6:00 a.m. -- at 5:30 in the
4  morning for a safety meeting for a 6:00 a.m. start shift, and
5  they wouldn't be allowed to bill from 5:30 to 6:00 because all
6  they could bill was the 12 hours.

7            Also, there were sometimes afternoon safety meetings.
8  So, the testimony is going to be:  Well, we could either attend
9  one, we should attend both, but if we were busy during the
10 second, it was okay as long as we attended one.  So, they each
11 missed out on one half hour a day for the safety meetings they
12 were not allowed to bill for, which amounts to about $10 a day;
13 $10 a day to attend that safety meeting that they should have
14 been paid.  We're making a claim for that, and, alternatively,
15 and also, we're making a claim for the other 8 hours that they
16 billed on the 16-hours shifts, one-man crews.

17           What you're also going to hear is evidence we believe
18 that shows that even when they were working on a two-man crew,
19 when they worked from 6:00 to 6:00, if something happened in
20 the middle of the evening, if something happened during the
21 next man's shift and they had to go out to help cover them,
22 that they would have to go out and work for them and still only
23 be allowed to bill for that 12 hours per day, even if they had
24 to work extra through the day.

25           What does that show?  It shows corporate greed and

1  arrogance.  Corporate greed in that, for example, with the two-
2  man crews, we're only asking for the time that they worked,
3  that they actually worked, that they showed the safety
4  meetings, that they attended the safety meetings and weren't
5  paid, but the company's making a profit, and they still want to
6  deprive them of that half hour a day, about $10 a day for these
7  men.  They also, because they only billed for 16 hours for one-
8  man crews, they didn't want to pay them for the extra hours.
9  And you've got to understand that these companies are trying to
10 make a profit and they're competing against other companies, so
11 they're only going to bill for 16 hours for a one-man crew and
12 then make their employees continue to work, knowing that they
13 had to continually monitor this equipment day or night, that
14 they were on a 24-hour, one-man crew, not get any sleep; the
15 trailers were occupied by multiple individuals.  And don't let
16 them confuse the issues; because I believe that what they're
17 going to do is try to use two-man crew testimony to present
18 regarding one-man crew, to say:  Oh, no, there was always
19 another guy; they had time to take breaks; they had time to
20 watch TV; they had time to sleep.  But when you hear the
21 evidence regarding the one-man crews, you're going to hear:  I
22 couldn't sleep; I maybe got two hours, three hours, four hours,
23 but we had to constantly monitor that equipment, because if it
24 broke down we got in trouble.
25             I didn't get to tell you a lot about myself when we

8

1  started picking the jury.  I grew up in Houston.  We grew up in
2  the poor side of Houston, the Fifth Ward, if any of you know
3  Houston.  And my dad was a driver.  He did delivery driving in
4  Houston; and he was making about minimum wage.  It was my mom,
5  I had five sisters, but two of them primarily grew up with me,
6  and we moved back to Houston to take care of my grandmother,
7  who had had a stroke, so we took care of her.  So, my dad
8  valued every dollar that he earned.  And when he made a little
9  extra, if he did a little overtime, that was chicken week.  We
10 got fried chicken on that Friday.  And that was always special
11 to us.  He always felt special because you could see that
12 brightness in his eyes when he got to say:  We're going to go
13 get chicken.  And today, if you can't tell, I still love my
14 fried chicken.  That's that special memory of when I was a kid,
15 when it was something special.  Because he said:  I've earned
16 this; I need to be paid what I earned.  He was a hard worker,
17 making sure he provided for us, and God bless him, he's helped
18 us to -- instilled in us to work hard, focus, and do the right
19 thing.
20         And that's what we're asking this company to do, do
21 the right thing, because they have not.  And you, as a jury,
22 get to look at that situation and say:  You didn't do the right
23 thing.  Don't make excuses.  Don't say:  Oh, no, they were
24 supposed to ask for permission ahead of time, when the company
25 knew they were working --

**EXCEPTIONAL REPORTING SERVICES, INC**

1     **MR. CROW:** Your Honor --

2     **MR. PONCIO:** -- throughout those hours.

3     **MR. CROW:** -- object. He's arguing his case.

4     **THE COURT:** Sustained.

5     **MR. PONCIO:** So, we believe that if you -- if you
6  follow the instructions with regard to the Fair Labor Standards
7  Act, that you'll see that they should have paid overtime, that
8  they disregarded their own company policies, because these men,
9  all these oilfield workers, 55 of them -- Mr. Favata and
10 Mr. Akin are just two of them. Mr. Schwab is in the back row
11 there; he's another one. And we'll have others that appear in
12 front of you. You'll see that they all said: No. Our
13 supervisor said if you work a one-man crew, you're only billing
14 16 hours; if you work a two-man crew, only 12 hours; you don't
15 get paid for safety meetings. But at one point they finally
16 decided: Oh, yeah, and we're going to pay for safety meetings.
17 And we'll show you that, where they finally say: We're going
18 to start paying for safety meetings. Because they didn't
19 always do that.

20            And we're going to ask you to look at the evidence,
21 look at the law, Fair Labor Standards Act, and you're going to
22 hear testimony from them that says: If you worked extra hours,
23 you're supposed to get paid those extra hours, whether or not
24 you got pre-approval.

25            So, we're going to ask, again -- for the 16-hour,

1  one-man days, we're going to ask that they be ordered to pay
2  for those additional 8 hours; and for the two-man days, we're
3  going to ask, for the relevant time period -- and we'll tell
4  you what that is -- we're going to ask that they be required to
5  pay for that half-hour safety meeting at $10.  Because, as my
6  father always told me, do the right thing.  And bless him; I
7  got to go to finish high school.  I was the first graduate; got
8  to go to college, on a scholarship, and got to go to law
9  school, and here I am, working for people who did the right
10 thing and who should be paid --
11          **MR. CROW:**  Your Honor --
12          **MR. PONCIO:**  -- for the work they did --
13          **MR. CROW:**  He's arguing his case again.
14          **THE COURT:**  Sustained.  Sustained.
15          **MR. PONCIO:**  Thank you.
16      **(Opening statement of Plaintiff concluded at 11:29 a.m.)**

# CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          April 16, 2014_

TONI HUDSON, TRANSCRIBER